# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLARENCE PATTERSON, | : | |
| Plaintiff, | : | CASE NO. 3:19-CV-147 (MPS) |
| | : | |
| v. | : | |
| | : | |
| ANGEL QUIROS, et al., | : | |
| Defendants. | : | June 24, 2019 |

---

## INITIAL REVIEW ORDER

On February 1, 2019, the plaintiff, Clarence Patterson, a *pro se* inmate currently confined at the Corrigan-Radgowski Correctional Institution ("Corrigan") in Uncasville, Connecticut, brought a civil rights action under 42 U.S.C. § 1983 against Angel Quiros, the District Administrator for the Department of Correction ("DOC"). ECF No. 1. This Court ordered the plaintiff to file an amended complaint because the allegations stated in the initial complaint related to other DOC officials not listed as defendants. *See* ECF No. 7. On March 5, 2019, the plaintiff filed a document entitled, "Status Report," which the Court construed as his amended complaint. ECF No. 8. The amended complaint listed fifteen DOC officials as defendants. One month later, the plaintiff filed a document entitled, "Memorandum: Motion for Attachment and Status Report," which the Court construed as an addendum to his amended complaint. ECF No. 9. The Court dismissed both pleadings without prejudice because they joined multiple unrelated causes of action based on events that occurred at two different correctional facilities over a two-year period. *See* ECF No. 10. The Court instructed the plaintiff to file a "Second Amended Complaint," alleging facts in support of one set of constitutional claims and showing how each defendant was personally involved in those constitutional deprivations. *See id.*

On May 22, 2019, the plaintiff filed a second amended complaint against seventeen defendants: District Administrator Angel Quiros, District Administrator Scott Erfe, Warden Wright, Nurse Samantha Doe, Officer Paolini, Nurse Rick Doe, Counselor Supervisor Moore, Counselor John Doe, District Administrator Mulligan, Medical Supervisor Jeff Stamp, Deputy Warden Peterson, Dr. Ricardo Ruiz, Grievance Coordinator Stephanie Doe, Unit Manager Molina, Correctional Treatment Officer Tross, Phone Monitor Peracchio, and Deputy Warden Guadarrama. ECF No. 12, pp. 2-3, 95-97. The plaintiff is suing all seventeen defendants for violating his First, Fourth, Eighth, and Fourteenth Amendment rights. For the following reasons, the second amended complaint is dismissed in part.

I.     Standard of Review

Under 28 U.S.C. § 1915A, the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Bell Atlantic*, 550 U.S. at 556). Nevertheless,

it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.     Factual Allegations

On February 13, 2018, the plaintiff received an epidural shot in his back for his effaced L4/L5 nerve root.  ECF No. 12, p.5.  Two days later, he returned to Osborn Correctional Institution ("Osborn") and was taken to the intake area to retrieve his personal property and receive his housing assignment.  *Id.*  Nurse Samantha evaluated the plaintiff in a storage area of the intake unit, noted where he had received his epidural shot, and told him that he needed to see a physician for an immediate follow-up.  *Id.* at 6.  She also told him that he needed a bottom bunk pass, but the admissions officers had already assigned him to a top bunk.  *Id.*  Samantha issued the plaintiff a thirty-day bottom bunk pass and told him that he would be seeing a physician in a few days.  *Id.*

While administering the intake screening, Samantha said that it was getting late, that she still had a lot of work to do in the medical unit, and that she wanted to get out on time.  ECF No. 12, p. 7.  She then walked with the plaintiff to a table where Supervisor Moore and Officer Paolini were screening other inmates into Osborn.  *Id.*  Samantha asked Paolini to have the plaintiff's bunk assignment switched to a bottom bunk, and Paolini agreed.  *Id.*  After Samantha left the unit, Paolini refused to make the switch.  *Id.* at 8.  He told the plaintiff that he had to use the top bunk in B-Block that was assigned to him.  *Id.*  The plaintiff then filed grievances against Samantha and Paolini.  *Id.*  However,

inmates who are not kitchen workers are not permitted to live or even visit the B-Block unit. *Id.* The plaintiff struggled up the stairs to the B-Block unit carrying his property because of his back pain. *Id.*

When he reached the B-Block unit, he was met by two officers working the evening shift. ECF No. 12, p. 9. Another inmate approached the plaintiff and told the officers to call a lieutenant and put him in segregation because he was "not living . . . with no faggot." *Id.* One of the officers told the plaintiff to go lock up because the lieutenant was coming to the unit and called another officer to assist the plaintiff in carrying his property. *Id.*

The following morning, the plaintiff called a nurse over to his cell. ECF No. 12, p. 10. He explained to the nurse that he had just received an epidural shot to his back and was wrongfully assigned to a top bunk. *Id.* The nurse told the plaintiff to explain the situation to the officials working the next shift. *Id.* Later, when the plaintiff was let out of his cell to receive his medication, he spoke to Officer Feldott about his bunk assignment. *Id.* at 10-11. Feldott informed Captain Griffith about the bunk issue, who told the plaintiff that he did not switch bunk assignments under any circumstances. *Id.* at 11. Griffith told him that, if he wanted his bunk switched, he would have to write a request to the operations unit. *Id.* The plaintiff wrote numerous requests to the medical unit to be moved to a bottom bunk and complained of persistent back pain. *Id.*

On March 7, 2018, the plaintiff was told that he was moving to the D-Block unit. ECF No. 12, p. 14. Officers Quinones and Feldott were rushing the plaintiff to pack his belongings. *Id.* As he was trying to retrieve his television from his top bunk, the plaintiff's right leg gave out, causing him to fall backwards and hit his head on the metal

locker in his cell.  ECF No. 12, p. 15.  The plaintiff's cellmate immediately ran out of the cell and yelled for officials to call a Code White, which signifies a medical response.  *Id.* When a Code White is called, officials must preserve video footage, write an incident report, and record the incident in the unit log book.  *Id.* at 16.  Officer Feldott came to the cell, saw the plaintiff on the floor in pain, and then asked Quinones whether they should call a Code White.  *Id.* at 15.  Quinones told Feldott not to call a Code White and that he would send for a wheelchair.  *Id.*  The plaintiff later filed a grievance against Quinones and Feldott based on their refusal to call a Code White and get him a bottom bunk.  *Id.* at 16.  He also filed several requests to Health Services Administrator ("HSA") Furey.  *Id.*

Twenty to thirty minutes after the fall, Nurse Rick came to the unit with a wheelchair for the plaintiff.  ECF No. 12, p. 17.  He and Feldott lifted the plaintiff off the ground and walked him down the stairs to where the wheelchair was positioned.  *Id.* While walking down the stairs, the plaintiff's leg gave out again, and he started to fall again, but Rick caught him.  *Id.*

The plaintiff waited in the medical unit for ten to twenty minutes before being evaluated.  ECF No. 12, pp. 17-18.  Rick did not review the plaintiff's intake screening, which called for a physician's assessment shortly after his admission to Osborn.  *Id.* at 18.  Rick performed a "routine" assessment of the plaintiff's injuries.  *Id.*  The plaintiff explained to him that he was in severe pain and did not feel like he could ambulate without a cane or crutch.  *Id.* at 18.  While reviewing the plaintiff's history, Rick noticed that he had been issued a temporary bottom bunk pass.  *Id.* at 19.  He called Feldott and Quinones and asked them why he had been assigned to a top bunk.  *Id.*  The plaintiff later heard Rick say over the phone, "I got this, don't worry about it, I'll take care of

everything." *Id.* Rick then examined the plaintiff, who had a large "knot" on the back of his head. *Id.* He told the nurse in the unit that the plaintiff had no "knot" or blood. *Id.* Rick told the plaintiff that he believed his story of falling off the bunk, but he refused to order x-rays, issue him a cane or crutch, or give him any pain medication. *Id.* He did, however, pick up the phone and tell officials that he was giving the plaintiff a bottom bunk pass in the East-4 unit and a three-day "feed back card" so that the plaintiff did not have to walk to the chow hall for his food. *Id.* at 20. Rick ordered the "feed back card" but erroneously sent it to the plaintiff's previous cell. *Id.*

On April 2, 2018, the plaintiff saw Dr. Wright at Osborn. ECF No. 12, p. 44. Dr. Wright referred him to the UConn Medical Center ("UConn") for an MRI in order to determine whether the fall on March 7 caused any new injuries to his back. *Id.*

On April 26, 2018, Warden Wright denied the plaintiff's grievance against Quinones. ECF No. 12, p. 37. Wright stated that, although the medical unit had issued the plaintiff a temporary bottom bunk pass, the plaintiff opted for a top bunk. *Id.* However, the plaintiff never opted for a top bunk. *Id.* He appealed Wright's decision to District Administrator Quiros. *Id.* at 38. Quiros falsely stated that he had previously rejected the level-2 appeal from the grievance against Quinones. *Id.*

The plaintiff later filed a level-3 appeal against Quiros to the Commissioner's Office. ECF No. 12, p. 38. When Quiros discovered that the plaintiff had complained to the Commissioner's Office, he instructed Boyd Carter, the grievance coordinator at Cheshire Correctional Institution ("Cheshire"), to send all level-3 appeals filed by the plaintiff directly to him as opposed to the Deputy Commissioner so that he could "destroy them" without disposition. *Id.* at 39. Carter complied and sent three of the plaintiff's

level-3 appeals directly to Quiros. *Id.* at 39-40. The plaintiff filed a grievance against

Quiros, claiming that he was falsifying dates on his appeals. *Id.* at 40. District

Administrator Erfe never answered the grievance against Quiros and refused to send it to

the Deputy Commissioner for adjudication. *Id.* at 41. The plaintiff continued to file

numerous grievances and appeals against Quiros, but they were all confiscated and/or

destroyed by Erfe. *Id.* at 43.

Over the next several weeks, the plaintiff was forced to ambulate long distances to

the chow hall and medication window in his painful condition. ECF No. 12, p. 21. He

filed a grievance against Rick for refusing to properly treat his condition. *Id.* He argued

that Rick could have transferred him to the J-1 Unit, which is designed for inmates with

limited mobility because it has a chow hall, religious services, school, medical unit,

library, and gymnasium all near each other. *Id.*

John Doe was the counselor for the D-Block unit. ECF No. 12, p. 24. One of the

responsibilities of the unit counselor is to make legal copes for the inmates in the unit.

*Id.* Doe made legal copies for the plaintiff on April 16, 26, and 30, 2018. *Id.* He also

made a legal phone call for the plaintiff on April 30. *Id.* On May 2, the plaintiff wrote a

request to Doe explaining that Warden Wright had predated his grievance disposition to

prevent him from filing a timely level-2 appeal. *Id.* at 25-26. He also requested the

copies that Doe had made for him days earlier. *Id.* at 26. Doe denied the plaintiff the

legal copies and explained to him that any additional copies would have to be made in the

library. *Id.* The plaintiff explained to Doe that the inmates in the D-Block were housed

in the gymnasium and that the library would be closed during the entire week, but Doe

refused to issue the copies. *Id.* at 26-27. Doe also told the plaintiff that he was on the list

to make a legal call, but the plaintiff never received his legal call at Osborn. *Id.* at 27. The plaintiff filed numerous grievances against Doe for denying him access to courts. *Id.*

On May 4, 2018, Supervisor Moore and Captain Colon came to the plaintiff's cell. ECF No. 12, p. 28. Moore told the plaintiff that Doe did not have to make legal copies for him. *Id.* The plaintiff told Moore that his unit was housed in the gymnasium and that library privileges had been suspended for the week, but Moore just told him to make copies the next time he was permitted access to the library, which was not for six days later. *Id.* The plaintiff also explained to Moore that Warden Wright consistently predated grievance dispositions to prevent timely appeals. *Id.* at 29. He showed Moore a law book indicating that Wright was violating the law and argued that Moore would be personally liable for the violation, but Moore just said that "he and the warden w[ere] the law." *Id.* The plaintiff later filed a grievance against Doe for refusing to make copies of a time-sensitive grievance. *Id.* at 30. Wright later rejected the grievance as repetitive. *Id.* He also filed a grievance against Moore for refusing to order Doe to make copies of his initial grievance, which became time-barred. *Id.* at 34. Wright responded to the grievance against Moore, stating that "counselors are not required to make inmate copies" and that it was "a courtesy." *Id.* at 35. However, the unit counselor is the only resource the plaintiff had for making legal copies. *Id.* at 36.

On May 9, 2018, the plaintiff went to UConn for the MRI ordered by Dr. Wright. ECF No. 12, p. 45. The MRI showed a large paracentral disc protrusion which abuts the descending L-4 nerve root. *Id.* As a result, Dr. Wright requested a ortho-spinal consultation and a cane for the plaintiff. *Id.* The expert with whom the plaintiff

consulted recommended that the plaintiff receive two epidural shots in his back by the end of the year. *Id.*

On May 22, 2018, HSA Furey called the plaintiff to his office and issued him a cane, which he admitted should have been issued on the day of his injury in the B-Block unit. ECF No. 12, p. 22. Furey also agreed to "chastise" Nurse Rick for not issuing a cane on the day of the incident and placing him in a cell one hundred yards from the chow hall and thirty yards from the medication window when there were open beds in the J-1 Unit. *Id.* During the meeting, Furey also confirmed that the only way an inmate, who was issued a bottom bunk pass, could be assigned to a top bunk is if he signed a medical refusal. *Id.* at 23. The plaintiff never signed a refusal for a top bunk. *Id.*

On May 23, 2018, the plaintiff was transferred from Osborn to Cheshire. ECF No. 12, p. 38. Upon his arrival, the plaintiff wrote to the medical unit, explaining that he had not received the two epidural shots prescribed by the orthopedist and that he needed to see a physician. *Id.* at 46. The next injection was supposed to be administered on June 13, but the plaintiff was not seen by a medical official until June 16. *Id.* At that meeting, Nurse Mark put the plaintiff on the list to see Dr. Ruiz, but Ruiz said that the epidural shots "w[ere] not important" and removed the plaintiff from his list of patients to be evaluated. *Id.* When the plaintiff asked Ruiz why he had refused to give him the two epidural shots in a timely manner, Ruiz said that he did not "believe in back surgery," that epidural shots are not safe unless there is pain in the patient's leg, and that he has seen other inmates respond with worse conditions. *Id.* at 47. However, the plaintiff's medical file showed that he had a prominent limp in his leg. *Id.* The plaintiff filed grievances against Ruiz, but Ruiz altered them by changing the time stamp to prevent

further investigation. *Id.* at 47-48. Moreover, Grievance Coordinator Stephanie "intentionally spoliated" the grievances against Ruiz. *Id.* at 53.

The plaintiff wrote to Jeff Stamp, Ruiz's supervisor, complaining about the lack of proper treatment at Cheshire. ECF No. 12, p. 52. He complained that officials had been administering Neurontin, which made him agitated and caused him unnecessary pain. *Id.* The plaintiff filed additional grievances against Stamp when he did not respond to his complaint. *Id.* at 53.

On September 15, 2018, Grievance Coordinator Stephanie came to the plaintiff's cell with another officer to administer the plaintiff's medication. ECF No. 12, p. 53. She told the plaintiff that she had no time "to answer [his] 20-page grievance against Supervisor Stamp and that [his] grievance against Dr. Ruiz [was] not [yet] ripe for process[ing]." *Id.* at 53-54. She added that she could not get much done because of her many responsibilities in the medical unit. *Id.* at 54. Stephanie promised to answer the grievance against Stamp but never did. *Id.*

The plaintiff was transferred back to Osborn on September 17, 2018 and then returned to the restrictive housing unit ("RHU") at Cheshire on September 21, 2018. ECF No. 12, p. 54. The plaintiff contends that Stephanie knew he would be transferred when she promised to answer his grievance against Stamp. *Id.*

On September 24, 2018, Stephanie came to the RHU to deliver the plaintiff's medication. ECF No. 12, p. 55. When the plaintiff asked her why she had not answered the grievance against Stamp, Stephanie said that she had only promised to put the grievance disposition in the mail, not to deliver it to the plaintiff personally. *Id.* Because the plaintiff had been briefly transferred to Osborn, Stephanie "made sure that the

mailroom sent [the disposition] to [the plaintiff]." *Id.* The plaintiff accused Stephanie of lying and filed numerous grievances against her. *Id.* at 55-56.

At some point during the summer or fall of 2018, Unit Manager Molina called the plaintiff into her office and told him that he could no loner make copies of grievances or other administrative documents with the counselor and that he needed to use the library. ECF No. 12, p. 59. The plaintiff had been making well over seventy copies per month with Counselor Santiago and CTO Tross. *Id.* The plaintiff explained to Molina that the level-1 grievance grants him access to the courts and that her reading of his grievance violated his Fourth Amendment protections against unreasonable searches and seizures. *Id.* He also showed Molina the rule at Cheshire which provided that copies could be made available to inmates via the unit counselor. *Id.* Molina said that she would hold his legal copies for twenty days. *Id.* When the plaintiff told Molina that he had sued a DOC official for withholding legal mail and won a substantial amount of money, Molina, Shelton, and Tross then began retaliating against him. *Id.* at 59-60. Molina told the plaintiff that she would no longer respond to his requests in writing and would only respond verbally to prevent him from filing grievances. *Id.* at 60.

The plaintiff wrote to Deputy Warden Guadarrama about Molina's conduct. ECF No. 12, p. 61. Although he acknowledged receiving the written complaint, Guadarrama never issued a written response. *Id.*

On September 7, 2018, CTO Tross issued a false disciplinary report ("DR") for making threats. ECF No. 12, p. 62. A short time later, Molina and other officers extracted the plaintiff from his cell and escorted him to segregation. *Id.* During the escort, the plaintiff pleaded with Molina to review the DR, which would show that no

threats were made, but Molina refused. *Id.* The plaintiff later filed grievances and complaints against Molina. *Id.* The false threats DR was later dismissed. *Id.* at 63, 68.

When the plaintiff returned to Cheshire on September 21, 2018, an official told him that, as a level-3 inmate, he should be housed in South Block 5 or 6, but there were no bottom bunks available in those blocks. ECF No. 12, p. 73. He was ultimately assigned to a top bunk in South Block 5 and given a cane. *Id.* When he reached his cell, the plaintiff could not climb to the top bunk. *Id.* His cellmate retrieved the mattress from the top bunk and placed it on the floor so the plaintiff could sleep. *Id.* The next morning, an official woke up the plaintiff and told him that he was not permitted to sleep on the floor and that a lieutenant had been called. *Id.* at 74. The plaintiff also noticed numerous ants crawling all over him and his mattress. *Id.* The official told the plaintiff that the lieutenant will transfer him to a bottom bunk elsewhere in the facility later that afternoon, but that never occurred. *Id.*

On September 24, 2018, the plaintiff was instructed to go to the A&P room to retrieve his personal property. ECF No. 12, p. 74. When he exited his cell, five correction officers pinned him against a wall and then placed him in segregation. *Id.* The segregation placement was for the same DR issued by Tross for making threats, which was later dismissed. *Id.* The plaintiff was placed in segregation three different times for the same false DR. *Id.* at 75. He filed several grievances and appeals challenging his segregation placement. *Id.*

The plaintiff left segregation on September 26, 2018. ECF No. 12, p. 76. It was then he learned that all of the grievances he filed regarding the failure of prison officials to assign him to a bottom bunk had been denied by Warden Wright and that the appeals

had been rejected by District Administrator Quiros.  *Id.*  He was placed back in South Block 5 with a convicted murderer.  *Id.*  He built a barrier in the cell, separating him from his cellmate.  *Id.* at 77.

The plaintiff continued to pursue administrative remedies against DOC officials. ECF No. 12, p. 77.  However, when he would go to the library to make copies of his documents, he often returned to find his legal paperwork in disarray.  *Id.*  The plaintiff believes that District Administrator Erfe and Deputy Warden Peterson were responsible for the destruction or seizing of his legal paperwork as an act of retaliation.  *Id.* at 78.

On October 16, 2018, the plaintiff was awakened in his cell and told that he needed to go to UConn to receive his second epidural shot.  ECF No. 12, p. 78.  The plaintiff walked to the A&P room without his cane.  *Id.*  However, when he sat down in the A&P room, his back stiffened.  *Id.*  Officer Sheldon placed the plaintiff and three other inmates being transported in a belly chain without checking to see if any of them had a medical pass, Sheldon told the plaintiff that he made a mistake but that the plaintiff must continue to wear the belly chain and may not bring his cane with him during the transport.  *Id.* at 79.  This forced the plaintiff to cancel his trip to UConn and sign a refusal form.  *Id.*  He later grieved the incident to District Administrator Erfe and Deputy Warden Peterson and attempted to file a habeas action against the officials.  *Id.*  Shortly thereafter, he was called down to the intelligence unit where Peterson told him that it was his fault that he did not go to UConn to receive his epidural shot and that "he had better stop writing outside the facility."  *Id.*

During the months of October and November 2018, the plaintiff endured freezing cold nights in his cell at Cheshire.  ECF No. 12, p. 80.  Often times, rain would pour into

his cell because the window was not properly sealed, and the heat did not turn on until December. *Id.* At one point, the plaintiff became sick with the flu and needed to go to the medical unit. *Id.* On October 29, the plaintiff stopped Peterson during his tour of the unit and explained to him the conditions in his cell, citing a Second Circuit decision regarding a similar situation with another prisoner. *Id.* Peterson did not offer any assistance to the plaintiff. *Id.* The plaintiff asked if Peterson could have him moved to a nearby cell with an empty bottom bunk. *Id.* Peterson refused but said that he would make sure that the maintenance department would fix the window in his cell. *Id.* at 81.

On December 3, 2018, a maintenance officer arrived at the plaintiff's cell with three inmate workers. ECF No. 12, p. 81. The officer told the plaintiff that he was not going to enter the cell and fix the window. *Id.* Instead, he pointed at one of the inmate workers and commanded him to fix the window. *Id.* However, the inmate worker was not experienced and did not properly seal the window. *Id.* He fell off the ladder while trying to seal the window, which prompted the official to seal the inmates inside the cell. *Id.*

Correction Officer Vargas later arrived at the plaintiff's cell. ECF No. 12, p. 81. When he asked if the plaintiff was okay, the plaintiff stood up and started to approach the door, but the fumes from the chemical used to seal the window were very strong and caused him to faint, falling backwards onto the bed and bang his head on the wall. *Id.* Vargas had the plaintiff extracted from the cell temporarily. *Id.* When the plaintiff returned to the cell, he immediately fell asleep from the fumes. *Id.*

On November 6, 2018, the plaintiff again asked Peterson to move him to another cell. ECF No. 12, p. 82. Peterson told him that he was not leaving the cell, but he

offered to send him to UConn the following day to receive his epidural shot if the plaintiff dropped the grievance from October 16 regarding the failed UConn trip. *Id.* The plaintiff agreed, and Peterson called the medical unit to arrange another trip to UConn. *Id.*

The plaintiff was sent to UConn for his second epidural shot on November 7, 2018. ECF No. 12, p. 83. Afterwards, he endured constant bleeding from the puncture area in his back for over a week. *Id.* He wrote requests to be evaluated by the medical unit, but medical officials refused to call him for an evaluation. *Id.*

During the trip to UConn, the plaintiff believes that Erfe and Peterson ordered his cellmate to steal his legal mail in his cell. ECF No. 12, p. 84. Three months later, the plaintiff filed a lawsuit against prison officials for tampering with his legal mail. *Id.* The Court issued a protective order against the officials to prevent further mail tampering. *Id.*

The plaintiff filed numerous requests and grievances against Erfe and Peterson for stealing his paperwork, failing to remedy the conditions in his cell, and for his "illegal visit to UConn." ECF No. 12, p. 85. District Administrator Mulligan denied the grievances, which the plaintiff contends was out of retaliation and to prevent the plaintiff from accessing the courts. *Id.* at 87.

On April 29, 2019, Officer Peracchio and Deputy Warden Guadarrama issued a false DR against the plaintiff for fighting with another inmate and placed him in segregation. ECF No. 12, pp. 89-90, 117. The plaintiff told Guadarrama that he was going to "write him up" for the false DR, and Guadarrama told him to do just that. *Id.* at 91. After ten days in segregation, Guadarrama instructed DR Investigator Wright to convince inmate Tucker, the other inmate allegedly involved in the fight, to "cop out" to

the DR. *Id.* at 92. If Tucker refused, officials would issue two additional DRs against him, resulting in additional sanctions. *Id.*

III. Analysis

The plaintiff has asserted five constitutional claims stemming from the foregoing allegations. He claims that the defendants (1) retaliated against him for exercising his First Amendment right to free speech, particularly his right to file grievances against prison officials, (2) acted with deliberate indifference to his serious medical needs, in violation of his Eighth Amendment protection against cruel and unusual punishment, (3) denied him equal protection of the laws under the Fourteenth Amendment,[1] (4) interfered with his ability to access the courts under the First and Fourteenth Amendments, and (5) violated his Fourth Amendment protection against unreasonable searches and seizures by reading, confiscating, and/or destroying his administrative grievances. ECF No. 12, pp. 95-97. He seeks damages and injunctive relief. *Id.* at 97. The Court will permit the retaliation and deliberate indifference to medical needs claims to proceed against some of the defendants.

A. Retaliation

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Riddick v. Arnone*, No. 3:11-CV-631 (SRU), 2012 WL 2716355, at *6 (D. Conn. Jul. 9, 2012). "To prevail on a First Amendment retaliation claim, [the plaintiff] must establish (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection

---

[1] The plaintiff raises equal protection and denial of access to courts claims under the Fifth Amendment. ECF No. 12, p. 96. However, the Fifth Amendment applies to the federal government, not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002). Thus, the Court will review his claims under the Fourteenth Amendment.

between the protected [speech] and the adverse action." *Holland v. Goord*, 758 F.3d 215,

225 (2d Cir. 2014) (internal quotation marks omitted); *Espinal v. Goord*, 558 F.3d 119,

128 (2d Cir. 2009). "In the prison context, 'adverse action' is objectively defined as

conduct 'that would deter a similarly situated individual of ordinary firmness from

exercising . . . constitutional rights.'" *O'Diah v. Cully*, No. 08-CIV- 941 (TJM/CFH),

2013 WL 1914434, at *9 (N.D.N.Y. May 8, 2013) (quoting *Davis v. Goord*, 320 F.3d

346, 353 (2d Cir. 2003)); *see also Ramsey v. Goord*, 661 F. Supp. 2d 370, 399 (W.D.N.Y.

2009) (prisoners may be required to tolerate more than average citizens before alleged

retaliatory action against them is considered adverse). In order to allege causation, the

plaintiff must state facts "suggesting that the protected conduct was a substantial or

motivating factor in the prison official's decision to take action against [him]." *Moore v.

Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp.

2d 349, 367 (S.D.N.Y. 2009)).

"Because claims of retaliation are easily fabricated, the courts consider such

claims with skepticism and require that they be supported by specific facts; conclusory

statements are not sufficient." *Riddick*, 2012 WL 2716355, at *6; *see also Dawes v.

Walker*, 239 F.3d 489, 491 (2d Cir. 2001) ("virtually any adverse action taken against a

prisoner by a prison official – even those otherwise not rising to the level of a

constitutional violation – can be characterized as a constitutionally proscribed retaliatory

act"), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

"Accordingly, plaintiffs in retaliatory motive cases must plead 'specific and detailed

factual allegations which amount to a persuasive case' or 'facts giving rise to a colorable

suspicion of retaliation.'" *Moore*, 92 F. Supp. 3d at 120 (quoting *Johnson v. Eggersdorf*,

8 F. App'x 140, 144 (2d Cir. 2001)).

Construing his allegations liberally, the Court concludes that the plaintiff has stated a plausible retaliation claim against Tross and Molina for filing a false DR against him and placing him in segregation after he filed numerous grievances against DOC officials and sued one official for withholding his legal mail. *See* ECF No. 12, pp. 59-63. Although somewhat conclusory, the Court will also permit a retaliation claim to proceed against Quiros, who, after discovering that the plaintiff had complained to the Commissioner about his rejection of an appeal, allegedly instructed the grievance coordinator at Cheshire to send all of the plaintiff's administrative appeals directly to him, which he later rejected, as opposed to the DOC central office. *See id.* at 38-39. To the extent the plaintiff claims that the other defendants retaliated against him, his claim is dismissed. The plaintiff has concluded without factual support that the remaining defendants denied, ignored, or refused to respond to his grievances in retaliation for his complaints about various interactions with DOC officials. Thus, the First Amendment retaliation claims may proceed against Molina, Tross, and Quiros but are dismissed as to the remaining defendants.

### B. Deliberate Indifference to Medical Needs

To state a claim for deliberate indifference to a serious medical need, the plaintiff must show both that his medical need was serious and that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 492 U.S. 97, 105 (1976)). There are both objective and subjective components to the deliberate indifference standard. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Objectively, the alleged deprivation must be

"sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Subjectively, the defendants must have been actually aware of a substantial risk that the plaintiff would suffer serious harm as a result of their actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 280–81 (2d Cir. 2006). Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under § 1983; *see id.* at 280; nor does a difference of opinion regarding what constitutes an appropriate response and treatment. *See Ventura v. Sinha*, 379 F. App'x 1, 2–3 (2d Cir. 2010); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

The Court concludes that the plaintiff has stated a plausible Eighth Amendment claim for deliberate indifference to medical needs against Paolini, Nurse Rick, Ruiz, Nurse Stephanie, Quiros, and Wright. He alleges that (1) Paolini refused to honor his temporary bottom bunk pass for his medical condition; ECF No. 12, p. 8; (2) Nurse Rick refused to order x-rays, issue him a cane or crutch, or give him pain medication after falling off his bunk on March 7, 2018; *id.* at 19; (3) Ruiz refused to send him for his second epidural shot and removed him from his list of patients to evaluate because "he did not believe in back surgery;" *id.* at 46; (4) Nurse Stephanie refused to address his complaints about the inadequate medical treatment at Cheshire; *id.* at 53-55; and (5) Wright and Quiros rejected numerous complaints he filed regarding officials' refusal to honor his bottom bunk pass. *Id.* at 76. The plaintiff's allegations against the remaining defendants are insufficient to show that they acted with deliberate indifference to his medical needs. Therefore, the Court will permit the Eighth Amendment claim to proceed against Paolini, Nurse Rick, Ruiz, Nurse Stephanie, Quiros, and Wright, but the claim is dismissed as to the remaining defendants.

C.  Equal Protection

"The Equal Protection Clause . . . commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "To state an equal protection claim, [the] plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Trowell v. Theodarakis*, No. 3:18-CV-446 (MPS), 2018 WL 3233140, at *3 (D. Conn. July 2, 2018) (*quoting Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).  The plaintiff may also state an equal protection violation claim under the "class of one" theory by showing that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The plaintiff has failed to allege facts suggesting that he was treated differently from other similarly situated inmates.  Therefore, his equal protection claims are dismissed.

D.  Denial of Access to Courts

"[T]o state a claim for denial of access to the courts, [the] plaintiff must demonstrate that he suffered an actual injury, *see Lewis v.* Casey, 518 U.S. 343, 353 (1996) – that is, he must allege that [the] 'defendant[s'] conduct deprived him of an

opportunity to press some nonfrivolous, arguable cause of action in court.'" *Baker v. Weir*, No. 3:16-CV-1066 (JAM), 2016 WL 7441064, at *2 (D. Conn. Dec. 27, 2016) (quoting *Brown v. Choinski*, No. 3:09-CV-1631 (MRK), 2011 WL 1106232, at *5 (D. Conn. Mar. 23, 2011)). "[The] plaintiff must allege not only that the defendant[s'] alleged conduct was deliberate and malicious, but also that [their] actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CIV-2042 (LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001). "[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354.

In this case, the plaintiff claims that many of the defendants denied him access to the courts by failing to respond to, altering, destroying, or rejecting, his grievances against other DOC officials or refusing to make photocopies for him. These allegations, which are conclusory in nature, are not sufficient to state a plausible denial of access to courts claim. The plaintiff has not alleged sufficient facts showing that the defendants' actions prevented him from pursuing a meritorious claim in state or federal court. Therefore, his denial of access to courts claim is dismissed.

E.  Fourth Amendment

The Fourth Amendment protects against unreasonable searches and seizures. *Katz v. United States*, 389 U.S. 347, 353 (1967). The Fourth Amendment governs when the person has an actual or subjective expectation of privacy and that expectation is one that society recognizes as reasonable. *Id.* at 361. If those conditions are satisfied, then the Court must determine whether the search or seizure at issue was reasonable. *Id.*

"The Supreme Court has held that 'the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell,' and therefore cannot state a claim under § 1983, even if the search was intended simply to harass the inmate." *Griffin v. Komenecky*, No. 95-CV-796 (FJS) (DNH), 1997 WL 204313, at *2 (N.D.N.Y. Apr. 14, 1997) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 529-30 (1984)). Prisoners do maintain a limited right to privacy in their prison correspondence, but any expectation of privacy in prison correspondence would yield to the legitimate penological interests of the prison facility. *See Dillhunt v. Theriault*, No. 9:07-CV-0412 (GTS/DEP), 2009 WL 4985477, at *10 (N.D.N.Y. Dec. 15, 2009). "[T]he interception of a defendant's prison correspondence does not violate that individual's . . . Fourth Amendment right[] if prison officials had 'good' or 'reasonable' cause to inspect the mail." *United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998); *see also United States v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996); *Correa v. McLeod*, No. 3:17-CV-1059 (VLB), 2017 WL 2962884, at *2 (D. Conn. Jul. 11, 2017).

Here, the plaintiff alleges that Molina read one of his grievances against a DOC official. *See* ECF No. 12, p. 59. This allegation, alone, does not state a plausible Fourth Amendment claim against Molina. The plaintiff has not sufficiently alleged facts showing that he had a reasonable expectation of privacy in an internal DOC administrative grievance against a prison official. There are insufficient allegations showing that Molina, or any of the defendants, inspected outgoing correspondence or otherwise violated his Fourth Amendment rights. Therefore, the Fourth Amendment claim is dismissed.

**ORDERS**

(1) The plaintiff's First Amendment retaliation claim may proceed against Molina, Tross, and Quiros.  The Eighth Amendment claim for deliberate indifference to medical needs may proceed against Paolini, Nurse Rick, Ruiz, Nurse Stephanie, Quiros, and Wright.  All other claims are dismissed.  The clerk is directed to terminate Erfe, Samantha Doe, Moore, John Doe, Mulligan, Stamp, Peterson, Peracchio, and Guadarrama as defendants to this action.

(2) Because the plaintiff has paid the filing fee to commence this action and has not been granted *in forma pauperis* status, he is responsible for serving Counselor Supervisor Molina, CTO Tross, Officer Paolini, Nurse Rick, Dr. Ruiz, Nurse Stephanie, District Administrator Quiros, and Warden Wright in their individual and official capacities.  Within **ninety (90) days** from the date of this Order, the plaintiff must serve a summons and a copy of his second amended complaint on those defendants in their individual and official capacities in accordance with Federal Rule of Civil Procedure 4. If the plaintiff has questions about effecting service, he may contact the Inmate Legal Aid Program ("ILAP").

(3) The defendants shall file their response to the second amended complaint, either an answer or motion to dismiss, within **twenty-one (21) days** after service.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules of Civil Procedure.

(4) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within **six**

**months (180 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(5) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(6) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(7) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in the dismissal of the case.  The plaintiff must give notice of a new address even if he is incarcerated.  He should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address.  He should also notify the defendants or defense counsel of his new address.

It is so ordered.

Dated at Hartford, Connecticut this 24th day of June 2019.

          /s/
Michael P. Shea
United States District Judge