UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CLARENCE PATTERSON,                    :
          Plaintiff,                   :
                                       :
v.                                     :          3:19cv147 (MPS)
                                       :
ANGEL QUIROS, et al.                   :
          Defendants.                  :

RULING ON MOTION FOR SUMMARY JUDGMENT

On February 1, 2019, the plaintiff, Clarence Patterson, a *pro se* sentenced[1] inmate

currently confined at the MacDougall-Walker Correctional Institution ("MacDougall") of the

Connecticut Department of Correction ("DOC"), commenced this civil rights action under 42

U.S.C. § 1983. Compl. (ECF No. 1). On May 22, 2018, Patterson filed the operative Second

Amended Complaint. Second Am. Compl. (ECF No. 12).

On initial review of the Second Amended Complaint, the court permitted Patterson's

Eighth Amendment medical deliberate indifference claims to proceed against Osborn

Correctional Institution ("Osborn") Correctional Officer ("CO") Linda Paolini, Osborn

Correctional Head Nurse ("CHN") Richard Matzko (previously identified as Nurse Rick), former

Osborn Warden Gary Wright, Dr. Ricardo Ruiz, Cheshire Correctional Institution ("Cheshire")

Nurse Stephanie McClain (previously identified as Nurse Stephanie), and then Deputy

Commissioner Angel Quiros.   The court also permitted Patterson's First Amendment retaliation

claims to proceed against Counselor Supervisor ("CS") Molina, Correctional Treatment Officer

---

[1] Information available on the DOC website under inmate information shows that on October 28, 2014, Patterson was sentenced to ten years and six months of imprisonment. *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (The Court may "take judicial notice of relevant matters of public record."). *See* ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=115092.

("CTO") Tross (previously identified as T. Ross), and then Deputy Commissioner Quiros. IRO (ECF No. 15).

The Defendants have filed a motion for summary judgment as to all claims against them. Mot. for Summary Judg. (ECF No. 68). Patterson has filed two opposition briefs (entitled "Motion in Opposition to Defendants' Motion for Summary Judgment). Pl.'s Opp. (ECF Nos. 70, 74).[2] Patterson asserts his opposition against only five of the defendants, CO Paolini, CHN Matzko, Quiros, Dr. Ruiz, and McClain. *Id.* at 1. As Patterson has clearly indicated that he is no longer proceeding against the other Defendants, the court will grant the motion for summary judgment on Patterson's claims against Warden Wright, CS Molina, and CTO Tross. This Ruling considers whether Patterson's claims against CO Poalini, CHN Matzko, Quiros, Dr. Ruiz, and McClain survive the Defendants' motion for summary judgment.

After carefully considering the materials submitted by the parties, the court will grant in part and deny in part the motion for summary judgment .

## I. FACTS[3]

---

[2]The opposition briefs are essentially identical.

[3]This factual background reflects the court's review of the Second Amended Complaint (ECF No. 12); the Defendant's Local Rule 56(a)1 Statement ("Defs.' 56(a)1") (ECF No. 68-2) and attached exhibits (ECF Nos. 68-3 to 68-20, 69); and Patterson's Local Rule 56(a)2 Statement of facts in opposition (Pl.'s 56(a)2) (ECF No. 73), affidavit ("Pl.'s Aff.") (ECF No. 71, 72), and attached exhibits . The Defendants have informed Patterson of the requirements for filing his papers in opposition to the motion for summary judgement under Local Rule 56. Notice (ECF No. 68-21). Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Patterson's Local Rule 56(a)2 Statement responds to only selective facts, and his responses are not consistently in compliance with Rule 56(a)2 and (a)3. To the extent that Patterson's Local Rule 56(a)2 Statement is nonresponsive to a statement of fact or does not comply with Local Rule 56, the court may

Remaining Claims

On initial review, the court held that Patterson had stated plausible Eighth Amendment deliberate indifference claims based on his allegations that CO Paolini refused to honor a temporary bottom bunk pass related to Patterson's medical condition; that CHN Matzko refused to order x-rays, issue Patterson a cane or crutches, or provide him with pain medication after he fell on March 7, 2018; that Dr. Ruiz refused to send Patterson for a second epidural shot and removed him from a list of patients to evaluate because he did not believe in back surgery; that Nurse McClain refused to address Patterson's complaints regarding his inadequate medical treatment at Cheshire; and that Quiros rejected complaints he filed regarding refusals to honor his bottom bunk pass. IRO at p. 19. The court also concluded that Patterson's allegations raised plausible First Amendment claims. IRO at p. 18. Patterson alleged that Quiros had discovered his Level-3 Grievance complaining to the Commissioner about Quiros, and Quiros had instructed the Cheshire grievance coordinator to send all of the Patterson's administrative appeals to him rather than to the DOC central office so that he could destroy Patterson's Level 3 Grievances without disposition. Second Am. Compl. at pp. 38-39.

Bottom Bunk Pass

On February 15, 2018, Patterson was transferred to Osborn during the second shift and arrived at the inmate intake area. Defs.' 56(a)1 at ¶ 3; Defs.' Ex. E, Paolini Declar. at ¶ 8; Defs.' Ex. K, Moore Declar. at ¶ 8.   CO Tarik Moore was the assigned Admitting and Processing (A&P) Officer. Defs.' 56(a)1 at ¶ 4; Defs.' Ex. E, Paolini Declar. at ¶ 12; Defs.' Ex. K, Moore

---

consider the Defendants' statement of fact to be admitted if supported by evidence.

Declar. at ¶ 5. As the A&P Officer, CO Moore's duties included assuring all master and medical files arrived and left with the inmate population, as well as assigning incoming population with housing assignments and bed placements. Defs.' 56(a)1 at ¶ 5; Defs.' Ex. E, Paolini Declar. at ¶ 13; Defs.' Ex. K, Moore Declar. at ¶ 6. In his declaration, CO Moore states that he was in charge of providing Patterson with a bunk assignment when he arrived at the facility and that he was not aware that Patterson had a bottom bunk pass issued by the medical unit when he assigned Patterson to cell B-61A, a top bunk. Defs.' Ex. K, Moore Declar. at ¶¶ 9, 12.

During that same shift, CO Paolini was the assigned Property Officer. Defs.' 56(a)1 at ¶ 6; Defs.' Ex. E, Paolini Declar. at ¶ 5; Defs.' Ex. K, Moore Declar. at ¶ 10. As the Property Officer, Paolini's duties included taking inventory of the property of inmates either transferring into or out of Osborn. Defs.' 56(a)1 at ¶ 7; Defs.' Ex. K, Paolini Declar. at ¶ 6. According to the declarations of both CO Paolini and Moore, Paolini's sole interaction with Patterson was to inventory his property upon his arrival at Osborn. Defs.' Ex. E, Paolini Declar. at ¶ 11; Ex. K, Moore Declar. at ¶ 18.

CO Moore avers that when he became aware that Patterson had been issued a bottom bunk pass, he informed Patterson that "DOC operations" would locate a bottom bunk for him and that he would escort Patterson to the medical unit to be housed until a bottom bunk could be located. Defs.' Ex. K, Moore Declar. at ¶ 14. He explains that Patterson informed him that he did not want to wait for a bottom bunk and would accept the top bunk assigned to him for the night and would inform the day shift about his bottom bunk pass the following day. *Id.* at ¶¶ 15-16.

Patterson's Injury

4

On March 7, 2018, CHN Matzko was called to respond to an accident that had reportedly occurred in Patterson's cell while Patterson was climbing to his top bunk and fell backward. Defs.' 56(a)1 at ¶ 15; Defs.' Ex. F, Matzko Declar. at ¶ 7; Defs.' Ex. L, Medical Records at pp. 24-26. According to the medical record and Matzko's declaration, Matzko observed Patterson lying on his right side and complaining about right lower back pain and numbness down his right leg, as well as having hit his occipital bone (the back of his head) against his locker; and after examining Patterson, CHN Matzko noted no swelling, ecchymosis, or open areas and found that Patterson's neurological signs were normal. Defs.' Ex. F, Matzko Declar. at ¶¶ 8, 10; Defs.' Ex. L, Medical Records at pp. 24-26. At the time, Matzko observed that Patterson could walk to a wheelchair with a limp, and he determined that x-rays were not medically necessary as there was no swelling, bruising or open area, and a cane was not necessary as Patterson could move about without one. Defs.' Ex. F, Matzko Declar. at ¶ 11, 17, 18; Defs.' Ex . L, Medical Records at pp. 24-26.

CHN Matzko provided Patterson with Motrin and an ice bag for any pain, as well as a bottom bunk/bottom tier pass and "feedback status" for three days. Defs.' Rule 56(a) at ¶ 19; Defs.' Ex. F, Matzko Declar. at ¶¶ 12-14; Defs.' Ex. L, Medical Records at pp. 24-26, 23.[4] CHN Matzko advised Patterson to return to the medical unit if his pain worsened. Defs.' 56(a)1 at ¶¶ 22, 26; Defs.' Ex. F, Matzko at ¶¶ 15, 17; Defs.' Ex. L, Medical Records at pp. 24-26.

---

[4] The bottom bunk/bottom tier pass allowed Patterson to be assigned to a bottom bunk bed on the bottom level of his housing unit, and feedback status allowed Patterson to have his meals delivered to his cell so that he could avoid having to walk to the mess hall to eat. Defs.' Rule 56(a)1 at ¶¶ 20-21; Defs.' Ex. F, Matzko Declar. at ¶¶ 13, 14.

From March 8, 2018 forward, Patterson was housed in a bottom bunk on the bottom tier of his unit at Osborn. Defs.' 56(a)1 at ¶ 28; Defs.' Ex. E, Paolini Declar. at ¶¶ 20-21; Defs.' Ex. O, Bunk Assignment Record.

On April 4, 2018, Patterson met with Dr. Wright complaining of a worsened limp.[5]  Dr. Wright requested an MRI for Patterson and recommended that he take Motrin as needed to help discomfort, but did not order a cane or x-ray. Defs.' Ex. L, Medical Records at pp. 22-23.

<u>Grievances Against Paolini and Other Correctional Staff</u>

Patterson subsequently filed three grievances against CO Paolini and two other correctional officers, Feldott and Quinones, regarding the failure to assign him a bottom bunk. Defs.' 56(a)1 at ¶ 28; Defs.' Ex. D, Wright Declar. at ¶ 9; Defs.' Ex. M, Grievances at pp. 3-4, 21-22, 25-26. In late April, Warden Wright issued responses denying as unsubstantiated Patterson's Grievances against Paolini and the other officers. Defs.' Ex. D, Wright Declar. at ¶¶ 5, 9; Defs.' Ex. M, Grievances at pp. 3-4, 21-22, 25-26.

Patterson filed Level 2 Grievances appeals, which were received in May 2018. Defs.' 56(a)1 at ¶ 37; Defs.' Ex. C, Quiros Declar. at ¶ 22; Defs.' Ex. M, Grievances at pp. 6, 23, 27, 60. At the time, Quiros served as the District Administrator, and part of his job was to review and respond to Level 2 Grievances filed by inmates. Defs.' 56(a)1 at ¶¶ 38, 39; Defs.' Ex. C, Quiros Declar. at ¶¶ 2, 6; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 6; *see also* Defs.' Ex. S, Administrative Directive ("A.D.") 9.6(6)(K)(1) (providing that Level 2 review is conducted by appropriate District Administrator).

---

[5]  Dr. Wright's handwritten note suggests that the visit took place on April 4, 2018; the accompanying consultation form also indicates that Patterson had an MRI of his spine on May 9, 2020, and that a report would follow.   ECF No. 69 at 22-23.

On May 31, 2018, Quiros denied Patterson's Level 2 Grievance related to his claim that CO Paolini had refused him a bottom bunk assignment. Defs.' 56(a)1 at ¶ 40, Defs.' Ex. C, Quiros Declar. at ¶¶ 18-19, 21, 23. *see* Defs.' Ex. M, Grievances at p. 6. This Level 2 Grievance was received on May 9, 2018, and indicates that Patterson had exhausted his administrative remedies and that a further Level 3 Grievance would not be answered. Defs.' Ex. M, Grievances at p. 6. On June 12, 2018, Quiros rejected Patterson's other Level 2 Grievances concerning the denial of a bottom bunk assignment by correctional staff. Defs.' Ex. M, Grievances at pp. 23, 27, 33, 60. These Level 2 Grievances were received by May 14, 2018, and Quiros indicated that they had been improperly filed and did not meet the criteria for a Level 3 Grievance. *Id.*

Quiros avers that he had no knowledge about Patterson's issue with his bottom bunk pass not being honored until he received and reviewed the Level 2 Grievances in May 2018. Defs.' 56(a)1 at ¶ 41; Defs.' Ex. C, Quiros Declar. at ¶ 24.

Under Administrative Directive 9.6, Level 3 Appeals are restricted to challenges to department policy, the integrity of the grievance procedure, and Level 2 Appeals to which there has been an untimely response by the District Administrator. Defs.' 56(a)1 at ¶ 45; *see* Defs.' Ex S, A.D. 9.6(6)(L). A Level 3 Appeal is reviewed by the Commissioner of Correction or his or her designee. Defs.' 56(a)1 at ¶ 44; *see* Defs.' Ex. S, A.D. 9.6(6)(L).

In his declaration, Quiros states he has no recollection of any grievance from Patterson that he disposed of at Level 2 that qualified for a Level 3 Grievance review. Defs.' 56(a)1 at ¶ 46; Defs. Ex. C, Quiros Declar. at ¶ 12.

Captain Debra Synott was the designated contact for Level 3 Grievances as she was the Statewide Grievance Coordinator. Defs.' 56(a)1 at ¶ 47; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 9;

Defs.' Ex. J, Synott Declar. at ¶ 8. ARC Boyd-Carter was the Administrative Remedies Coordinator ("ARC") at Cheshire Correctional Institution (CCI). Defs.' 56(a)1 at ¶ 48; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 2.

In her declaration, Boyd-Carter states that she forwarded to Captain Synott all Patterson's Level 3 Grievances that she received during the time relevant to this litigation. Defs.' 56(a)1 at ¶ 61; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 14. In her declaration, ARC Boyd-Carter recalls that around August 2018, she reviewed three grievances filed by Patterson that appeared to be Level 3 Grievances that had been disposed of at Level 2 by Quiros. Defs.' 56(a)1 at ¶ 49; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 10; Defs.' Ex. J, Synott Declar. at ¶ 7; Defs.' Ex. M, Grievances at pp. 12, 23, 27, 33, 35, 58-60. ARC Boyd-Carter forwarded these Level 3 Grievances to Captain Synott. Defs.' 56(a)1 at ¶ 50; Defs.' Ex. I, Boyd-Carter Declar. at ¶ 11; Defs.' Ex. J, Synott at ¶ 7.

After a review of the Level 2 Grievance dispositions, Captain Synott determined that each Grievance had been marked as ineligible for a Level 3 appeal. Defs.' 56(a)1 at ¶ 51; Defs.' Ex. J, Synott at ¶ 9; *see* Defs.' Ex. M at pp. 23, 27, 33, 60. Captain Synott also concluded that Patterson's grievances pertained to alleged improper conduct by DOC officials related to a bottom bunk pass, which did not qualify them as eligible for Level 3 review. Defs.' 56(a)1 at ¶ 52; Defs.' Ex. J, Synott Declar. at ¶¶ 10-12. In her declaration, Captain Synott explains that she concluded that Patterson had improperly filed these three Level 3 Grievances. Defs.' 56(a)1 at ¶ 53, Defs.' Ex. J, Synott Declar. at ¶ 13.

Both Quiros and Synott aver that Quiros was not involved with the Level 3 Grievance review process at the time relevant to this litigation. Defs.' 56(a)1 at ¶ 54; Defs.' Ex. C, Quiros

8

Declar. at ¶ 9; Defs.' Ex. J, Synott Declar. at ¶¶ 14-15.

Quiros avers that he was unaware of any grievance that Patterson may have filed against him in 2018 or early 2019; did not instruct ARC Boyd-Carter to send him Level 3 Grievances while he was District Administrator, including any Level 3 Grievances filed by Patterson; and did not destroy any Level 3 Grievances. Defs.' 56(a)1 at ¶ 56, 58-59; Defs.' Ex. C, Quiros Declar. at ¶ 11, 14, 17; *see also* Defs.' Ex. I, Boyd-Carter Declar. at ¶ 12. ARC Boyd-Carter avers that she never forwarded Quiros any Level 3 Grievances while Quiros was District Administrator, including any Level 3 Grievances filed by Patterson. Defs.' 56(a)1 at ¶ 60; Defs.' Ex. I, Boyd-Carter at ¶ 13.

Medical Care for Back Pain

On February 13, 2018, Patterson received an epidural steroid injection ("ESI"), which had been approved by the Utilization Review Committee ("URC"). Defs.' 56(a)1 at ¶ 62; Defs.' Ex. G, Ruiz Declar. at ¶ 7. An ESI is a technique that involves the injection of corticosteroids and a local anesthetic into the epidural space around a patient's spinal cord to improve pain related to spinal stenosis, spinal disc herniation, or both. Defs.' 56(a)1 at ¶ 63; Defs.' Ex. G, Ruiz Declar. at ¶ 8; *see* Defs.'s Ex. L, Medical Records at pp. 19, 22 (noting prior ESI).

On May 10, 2018, Dr Wright submitted a request to the URC for Patterson to receive an orthopedics-spine consult related to his history of back pain and discomfort. Defs.' 56(a)1 at ¶ 64; Defs.' Ex. G at ¶ 10; Defs.' Ex. L, Medical Records at p. 19. The URC request noted that Patterson was taking 2400mg of Neurontin and daily Motrin to deal with back pain and discomfort, had had an ESI that had "not provided any sustenance relief," and had a prior CT scan and MRI, which demonstrated issues with some of his discs abutting his nerve root,

correlating with Patterson's indicated back symptoms. Defs.' 56(a)1 at ¶ 65; Defs.' Ex. G, Ruiz Declar. at ¶ 10; Defs.' Ex. L, Medical Records at p. 19. The URC request sought an orthopedics-spine consult to determine the appropriate intervention for Patterson's back pain. Defs.' 56(a)1 at ¶ 66; Defs.' Ex. G, Ruiz at ¶¶ 10, 11; Defs.' Ex. L, Medical Records at p. 19.

On May 23, 2018, Patterson was transferred from Osborn to Cheshire. Defs.' 56(a)1 at ¶ 67; Defs.' Ex. G at ¶ 9; Defs.' Ex. L, Medical Records at pp. 20-21

On July 31, 2018, Patterson had his orthopedic-spine consult. Defs.' 56(a)1 at ¶ 69; Defs.' Ex. L, Medical Records at pp. 14-17. The medical record shows that Patterson discussed a long-standing history of low back pain, which became worse following his recent fall. Defs.' 56(a)1 at ¶70; Defs.' Ex. L, Medical Records at pp. 14-17. The consult report noted that Patterson had indicated the prior ESI was helpful, with a 50% reduction in pain, and that he denied any weakness. Defs.' 56(a)1 at ¶ 70; Defs.' Ex. L, Medical Records at pp. 14-17. The consult report also referenced Patterson's May 9, 2018 MRI that showed a disc extrusion resulting in moderate central stenosis with nerve root compression, which was consistent with Patterson's complaints of pain. Defs.' 56(a)1 at ¶ 71; Defs.' Ex. G, Ruiz Declar. at ¶ 12; Defs.' Ex. L, Medical Records at pp. 14-17. The consult concluded that a repeat ESI was reasonable, and Patterson could try a total of two more injections in 2018. Defs.' 56(a)1 at ¶ 72; Defs.' Ex. G, Ruiz at ¶ 12; Defs.' Ex. L, Medical Records at pp. 14-17. Finally, the consult noted that, should his symptoms persist after the two additional ESIs, Patterson could return for another consult regarding surgical options. Defs.' 56(a)1 at ¶ 73; Defs.' Ex. G at ¶ 12; Defs.' Ex. L, Medical Records at pp. 14-17.

On August 14, 2018, Dr. Ruiz submitted a URC request for Patterson to receive another ESI, consistent with the consult recommendation. Defs.' 56(a)1 at ¶ 75; Defs.' Ex. G, Ruiz Declar. at ¶ 13; Defs.' Ex. L, Medical Records at pp. 7, 18; Pl.'s Aff. at pp. 154-155. Dr. Ruiz explains that it was only appropriate to submit the URC ESI request after Patterson's July 31, 2018 consult so that the best course for Patterson's treatment could be determined. *See* Defs.' Ex. G, Ruiz Declar. at ¶¶ 23, 25.

Dr. Ruiz's URC request for an ESI for Patterson was ultimately approved and scheduled to occur on October 16, 2018, but Patterson refused to proceed with the trip to UCONN to receive the ESI. Defs.' 56(a)1 at ¶¶ 76-77; Defs.' Ex. G, Ruiz Declar. at ¶ 15; Defs.' Ex. L, Medical Records at pp. 7, 11-13; *see also* Second Am. Compl. at p. 79 (alleging that he was forced to cancel trip to UConn because he was told by officer Sheldon that he had to wear a belly chain and could not bring his cane).

Less than one month later, on November 7, 2018, Patterson's ESI was performed. Defs.' 56(a)1 at ¶ 78; Defs.' Ex. G, Ruiz Declar. at ¶ 16; Defs.' Ex. L, Medical Records at pp. 8-9; Pl.'s Aff. at p. 149. The medical note from November 7, 2018, contains recommendations for Patterson to be evaluated for a change of pain medication, and that he "may benefit from a repeat injection in four months." Defs.'s Ex. L, Medical Records at p. 8; Pl.'s Aff. at p. 149.

On April 29, 2019, Dr. Ruiz met with Patterson and discussed a recent hand injury. Defs.' 56(a)1 at ¶ 79; Defs.' Ex. G, Ruiz Declar. at ¶ 17; Defs.' Ex. L, Medical Records at p. 6. During this meeting, Dr. Ruiz reviewed Patterson's medical chart and noted he would generate another ESI request for Patterson. Defs.' 56(a)1 at ¶ 80; Defs.' Ex. G, Ruiz Declar. at ¶ 17; Defs.' Ex. L, Medical Records at p. 6. In his declaration, Dr. Ruiz opines that by April 29, 2019, sufficient

time had passed after Patterson's last ESI to initiate a request for another ESI. Defs.' 56(a)1 at ¶ 81; Defs.' Ex. G, Ruiz Declar. at ¶ 26.

At that appointment, Dr. Ruiz expressed his medical opinion that back surgery is best reserved for patients with neurologic deficits, and that its use for pain management is not advised given the risk for potential increase in the patient's chronic pain. Defs.' 56(a)1 at ¶¶ 82, 83; Defs.' Ex. G, Ruiz Declar. at ¶¶ 17, 27; Defs.' Ex. L, Medical Records at p. 6. The medical note reflects that Patterson indicated that he had been told this in the past and understood. Defs.' Ex. L, Medical Records at p. 6. Dr. Ruiz represents that he would not have prevented Patterson from having a second orthopedic specialist consult to discuss surgical intervention, but Patterson had not yet completed the two recommended ESIs by the time he had left Dr. Ruiz's care at Cheshire. Defs.' Ex. G, Ruiz Declar. at ¶ 27.

On April 29, 2019, Dr. Ruiz also submitted a URC request for Paterson's next ESI. Defs.' 56(a)1 at ¶ 84; Defs.' Ex. G, Ruiz Declar. at ¶ 18; Defs.' Ex. L, Medical Records at p. 2.

On May 16, 2019, Patterson was transferred to Corrigan Correctional Institution ("Corrigan"). Defs.' 56(a)1 at ¶ 85; Defs.' Ex. G, Ruiz Declar. at ¶ 19; Defs.' Ex. L, Medical Records at p. 5.

After an October 11, 2019 URC approval, Patterson received the ESI on October 14, 2019. Defs.' 56(a)1 at ¶ 86; Defs.' Ex. G, Ruiz Declar. at ¶ 20; Defs.' Ex. L, Medical Records at pp. 2-4.

Dr. Ruiz has no control over the URC approval process, which he cannot circumvent. Defs.' Rule 56(a) at ¶ 87; Ex. G at ¶ 24. All scheduled procedures and consults outside of DOC

are required to undergo separate requests and approvals. Defs.' 56(a)1 at ¶ 88. Ex. G, Ruiz

Declar. at ¶ 24.

<u>Grievance Review by Nurse McClain</u>

During the time relevant to this action, Nurse McClain was the temporary Administrative

Remedies Coordinator ("ARC") at Cheshire. Defs.' 56(a)1 at ¶ 91; Defs.' Ex. H, McClain

Declar. at ¶ 6. As the medical ARC, Nurse McClain's duties were to manage the processing of

inmate medical grievances and to facilitate responses by the appropriate medical professionals,

but not to procure specific medical treatment for grieving inmates. Defs.' 56(a)1 at ¶ 92; Defs.'

Ex. H, McClain Declar. at ¶¶ 7-8.

Patterson filed a Health Services Review ("HSR") that was received by the medical unit

on August 8, 2018. Defs.' 56(a)1 at ¶ 90; Defs.' Ex. H, McClain Declar. at ¶ 11; Defs.' Ex. P,

Patterson HSR Database Record; Defs.' Ex. N, Patterson HSR. In this HSR dated July 27, 2018,

Patterson complained, *inter alia*, that the Cheshire medical staff had ignored his need for a

cortisone shot and need for pain medication upon his transfer to Cheshire; that Supervisor Stamp

had refused to respond to his requests; that he had not received an injection as of July 27, 2018;

and that he should be transferred to another facility. Defs.' 56(a)1 at ¶ 93; Defs.' Ex. H, McClain

Declar. at ¶ 13; Ex. N, HSR.

McClain's preliminary review of Patterson's medical record showed that he had just

completed his orthopedics consult. Defs.' Rule 56(a)1 at ¶ 94; Defs.' Ex. H, McClain Declar. at ¶

14. McClain explains that Patterson's HSR was forwarded to Dr. Ruiz for review and response

because of the nature of the claim and the fact he had just had his orthopedic consult. Defs.'

56(a)1 at ¶ 94; Defs.' Ex. H, McClain Declar. at ¶ 15.

On August 28, 2019, Dr. Ruiz issued his response noting that a lumbar ESI had been requested. Defs.' 56(a)1 at ¶ 95; Defs.' Ex. G, Ruiz Declar. at ¶ 14; Defs.' Ex. H, McClain Declar. at ¶ 16; Defs.' Ex. N, Patterson HSR.

Nurse McClain avers that she has no recollection of other medical grievances that Patterson claims to have filed. Defs.' 56(a)1 at ¶ 96; Defs.' Ex. H, McClain Declar. at ¶ 18.[6] McClain notes that if an inmate requires immediate medical attention, the proper procedure is for the inmate to request that a unit officer contact the medical department to arrange for an appointment or to submit an inmate request form for an appointment with medical staff. Defs.' 56(a)1 at ¶ 97; Defs.' Ex. H, McClain Declar. at ¶ 19.

## II.    STANDARD OF REVIEW

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

"A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to

---

[6] Patterson responds that Nurse McClain failed to properly handle his HSR by sending it to Dr. Ruiz and by changing the date that it was received; failed to deliver his appeal related to Stamp; spoliated his Stamp Appeal, and stole and/or destroyed his Grievances against McClain, Dr. Ruiz, and Dr. Lichtenstein. Pl.'s 56(a)2 at ¶¶ 91, 92, 93, 95, 96; Pl.'s Aff. at ¶ 206, 215, 223, 224.

any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.    DISCUSSION

The Defendants argue that the evidence fails to support Patterson's claims that CO Paolini, CHN Matzko, Dr. Ruiz, Quiros, or Nurse McClain acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants argue further that Patterson's First Amendment retaliation claim against Quiros is speculative and conclusory.

### A.  Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners," whether "manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976). (internal quotation marks and citation omitted).

To show deliberate indifference to a serious medical need, a plaintiff must satisfy both an objective and a subjective element. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). First, the alleged deprivation "must be, in objective terms, sufficiently serious." *Id.* (quotations and citations omitted). "Second, the charged official must act with a sufficiently culpable state of mind." *Id.*

Under the objective prong, the inmate's medical need or condition must be "a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Factors relevant to the seriousness of a

medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

To satisfy the subjective prong, a prison official or medical staff member must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

"[M]ere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness," i.e., "a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

### 1. CO Paolini

In his Second Amended Complaint, Patterson alleges that a nurse named Samantha (who was conducting his intake screening but needed to leave) walked over to Moore and Paolini and asked Paolini, not Moore, to have Patterson's bunk assignment switched; however, CO Paolini refused to do so after Samantha left the intake unit. Second Am. Compl. at pp. 7-8. In his affidavit, Patterson asserts that Paolini rather than Moore was the staff member who refused to switch his bunk assignment; that Paolini was aware that Patterson had a limp, a bad back, and a

16

bottom bunk pass; and that she knew there was a substantial risk to Patterson's safety when she refused to provide him with a bottom bunk assignment. Pl.'s Aff. at  ¶¶ 12, 18.

Defendants have submitted evidence that Moore was the A&P Officer on February 15, 2018, and was responsible for the inmate bunk assignments, and that Paolini had no responsibility for cell or bunk assignments. *See* Defs.' Ex. E, Paolini Declar. at ¶¶ 12-14; Defs.' Ex. K, Moore Declar. at ¶¶ 5-6, 9.[7] Patterson has failed to submit any evidence rebutting this evidence.  He merely asserts that Moore is attempting "to take the [blame] for Paolini['s depraved actions by admitting falsely that he and not Paolini committed this constitutional violation[.]" Pl.'s Opp. at 4; *see also* Pl.'s Rule 56(a) at ¶ 8 ("Paolini assigned the plaintiff to Bunk B-61A 'Top Bunk' '<u>Not Moore</u>' who's injected himself into this claim to cover for his co-worker Paolini.").

Patterson cannot defeat a motion for summary judgment by relying on conclusory statements or on mere assertions that affidavits or declarations supporting the motion are not credible. *See Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *Sherman v. Kang*, 205 F.3d 1324, at *1 (2d Cir. 2000) (unpublished) ("[Plaintiff] was not entitled to have the [summary judgment] motion denied simply on the basis of conclusory statements she made in her affidavits or her contentions that affidavits submitted in support of the motion were not credible."). And his assertions about what Paolini "knew" are not "made on personal knowledge," as they must be in an affidavit opposing summary judgment.   Fed. R. Civ. P. 56(c)(4).

---

[7]  Moore has indicated that he attempted to remedy the bunk assignment error by housing Patterson in the medical unit until a bottom bunk could be located for him, but Patterson declined the offer. Defs.' Local Rule 56(a) at ¶ 12; Defs.' Ex. K at ¶¶ 12-16. Patterson's Rule 56(a)2 statement represents that he does not recall speaking to CO Moore about a bottom bunk pass. Pl.'s 56(a)2 at ¶ 12.

To prevail on a Section 1983 claim for damages, Patterson must show that CO Paolini had personal involvement in an Eighth Amendment violation arising from the refusal to provide Patterson with a bottom bunk at Osborn. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). Here, the Defendants' unrebutted evidence indicates that Paolini was not involved in this asserted Eighth Amendment deprivation.   And even if she was, Patterson has not adduced evidence to raise an inference that she harbored the requisite culpable state of mind when she assertedly failed to switch his assignment to a bottom bunk. No record evidence suggests that Paolini acted with deliberate indifference to Patterson's need for a bottom bunk beyond Patterson's own conclusory assertions that she knew that he required a bottom bunk assignment and that she was aware of the substantial risk of harm posed by her alleged refusal to provide him with one. Moreover, no evidence indicates that Paolini had any capacity to procure Patterson with a bottom bunk at that time. *See Cooper v. Cook*, No. 3:19-CV-01794 (JAM), 2020 WL 1923233, at *4 (D. Conn. Apr. 21, 2020) (Eighth Amendment deliberate indifference claim was not plausible because it failed to allege that defendants had the ability to procure dental care for plaintiff).   No reasonable juror could conclude on this record that CO Paolini acted with deliberate indifference to Patterson's need for a bottom bunk assignment. The motion for summary judgment must be granted in the Defendants' favor on this claim.

### 2.  Deputy Commissioner Quiros

Defendants argue that the evidence in the record does not suggest that Deputy Commissioner Quiros acted with deliberate indifference in response to the alleged failure of correctional staff to provide Patterson with a bottom bunk pass. Defs.' Mem. at 30-32. The court agrees.

18

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. Dec. 28, 2020), the Second Circuit held that a "plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). Thus, "[t]he violation must be established against the supervisory official directly." *Id.*

Here, the evidence shows that Patterson had received a bottom bunk assignment by March 8, 2018, and that Quiros did not consider Patterson's Level 2 Grievance about the bottom bunk pass until May 2018, after Warden Wright's denial of Patterson's Level 1 Grievance. *See* Defs.' 56(a)1 at ¶¶ 37, 40, 41, 42. No evidence in the record raises an inference that Quiros had any awareness that Patterson was in need of a bottom bunk assignment before he reviewed the grievance in May 2018, and no evidence suggests that he failed to take steps to remedy the situation. *See Andrews v. Gates*, No. 3:17-CV-1233 (SRU), 2019 WL 2930063, at *8 ("Although [plaintiff] notified each [prison official] after the assault, notice after the fact of an isolated incident is insufficient to establish supervisory liability."); *see also Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation. Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate."). Thus, no reasonable juror could conclude on this record that Quiros acted with deliberate indifference to Patterson's need for a bottom bunk assignment.

### 3.  CHN Matzko

Patterson alleges that CHN Matzko was deliberately indifferent to his serious medical needs by not providing him with an x-ray, use of a cane, and pain medication after his fall on March 7, 2018. Second Am. Compl. at pp. 17-19. The Defendants argue that Matzko did provide Patterson with medical care, and that Patterson's claims amount to mere negligence or a difference of opinion with his medical provider. Defs.' Mem. at pp. 32-35.

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, or the timing of their intervention are not generally adequate grounds for an Eighth Amendment claim as "[t]hese issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Sonds v. St. Barnabus Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Additionally, "[t]he plaintiff's own opinions about proper diagnosis and treatment are not admissible evidence and do not create a genuine dispute of fact." *Morales-Rojas v. Ruiz*, No. 3:17-cv-1434 (MPS), 2019 WL 1025245, at *6 (D. Conn. Mar. 4, 2019). A plaintiff must show that the defendant acted or failed to act with "culpable recklessness," or "a conscious disregard of a substantial risk of serious harm." *Id.* (quoting *Hathaway*, 99 F.3d at 553). A defendant therefore must have been "actually aware of a substantial risk that serious inmate harm would result." *Salahuddin*, 467 F.3d at 280.

"In certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703 (internal quotation marks omitted; citing example of prison doctors choosing to close a wound caused by the severing of the inmate's ear rather than attempting to reattach the organ). In addition, a

prison medical provider may be deliberately indifferent if he or she acts based on ulterior motives (such as monetary incentives) rather than on sound medical judgment. *Id*.

The record shows that CHN Matzko provided Patterson with an ice bag and Motrin for pain, a pass so that Patterson would have a bottom bunk on the bottom level of his housing unit, and "feedback status," which meant that he would not have to walk back and forth to the mess hall to get his meals. Defs.' Ex. F, Matzko Declar. at ¶¶ 12-14; Ex. L, Medical Records at pp. 25-26. As no reasonable juror could conclude based on the evidence that Matzko acted with deliberate indifference to Patterson's need for pain medication, the court will grant the Defendants' motion for summary judgment on this claim.

With respect to the claim concerning Matzko's failure to provide Patterson with a cane, crutches, or an x-ray, CHN Matzko's declaration explains that he determined that neither a cane nor crutches were necessary because he observed that Patterson was able to move without such assistive devices, and that an x-ray was not needed based on his assessment that Patterson showed no signs of having a broken bone or any other issues warranting an x-ray. Defs.' Ex. F, Matzko Declar. at ¶¶ 17-18. In response, Patterson avers that his "leg gave out" and "drove him to one knee" while CHN Matzko escorted him to the medical unit and that, contrary to Matzko's assertion that Patterson had no bruising, he "had [a] hickey on his head."   ECF No. 71 at 6; Pl.'s Aff. at ¶¶ 30-32, 35.   Patterson asserts that Matzko did not provide assistive devices or seek an x-ray because he was attempting to cover up the initial failure to assign him to a bottom bunk, and that Matzko made statements to others suggesting he would downplay Patterson's injuries to assist in a "cover up."   ECF No. 71 at 48.   In a grievance Patterson filed in early April 2018, he stated that he "could barely walk" when he reached the medical unit, ECF No. 71 at 53; after he

grieved this issue, Health Services Administrator Furey requested a cane for him.   ECF No. 71 at 6, 47.

In considering a motion for summary judgment, the Court cannot make credibility assessments, which are reserved for the jury. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."). Here, Patterson's version of the facts—that he was unable to walk without an assistive device during his escort to the medical unit, had a bruise on the back of his head, and that Matzko made statements suggesting he was downplaying Patterson's injuries to avoid any suggestion that the failure to assign Patterson to a bottom bunk had caused serious injuries, ECF No. 71 at 48 — raises a question of material fact about whether CHN Matzko's decision not to provide Patterson with a cane or crutches or to order x-rays was based on his sound medical judgment or other considerations. When the evidence in the record is viewed in the light most favorable to Patterson, a reasonable juror could determine that CHN Matzko acted with deliberate indifference to Patterson's serious medical needs.   The court will thus deny the motion for summary judgment on Patterson's Eighth Amendment claim related to Matzko's conduct in denying the x-ray and assistive devices.

### 4.  Dr. Ruiz

As stated in this Court's Initial Review Order, Patterson's Second Amended Complaint alleged:

> Upon his arrival [at Cheshire], the plaintiff wrote to the medical unit, explaining that he had not received the two epidural shots prescribed by the orthopedist and that he needed to see a physician. The next injection was supposed to be administered on June 13, but the plaintiff was not seen by a medical official until June 16. At that meeting, Nurse Mark

> put the plaintiff on the list to see Dr. Ruiz, but Ruiz said that the epidural shots "w[ere]
> not important" and removed the plaintiff from his list of patients to be evaluated. When
> the plaintiff asked Ruiz why he had refused to give him the two epidural shots in a timely
> manner, Ruiz said that he did not "believe in back surgery," that epidural shots are not
> safe unless there is pain in the patient's leg, and that he has seen other inmates respond
> with worse conditions.

IRO at p. 9 (citations omitted). Defendants argue that the evidence shows that Dr. Ruiz did not

act with deliberate indifference to Patterson's need for ESIs or back surgery. Defs.' Mem. at 35-

38. Patterson's opposition brief complains that Dr. Ruiz did not provide him with timely medical

treatment, and that Dr. Ruiz intentionally interfered with his prescribed treatment by not

assessing him at the facility after his arrival at Cheshire. Pl.'s Opp. at 18-19.[8]

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the

seriousness of the prisoner's medical conditions and the harm caused by any unreasonable

delay." *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (citing *Salahuddin*, 467

F.3d at 280) (other citations omitted) (summary order). The court's objective "serious medical

need inquiry can properly take into account the severity of the temporary deprivation alleged by

the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). The court should consider

the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather

---

[8]  Patterson's opposition also asserts that Dr. Ruiz failed to follow the expert's recommendation
that Patterson's pain medication of Neurontin be changed. *Id.* at 20. This claim is not in the case.   This
court's Initial Review Order considered Patterson's allegations that Patterson wrote to Jeff Stamp, Ruiz's
supervisor, complaining about the lack of proper treatment at Cheshire; that Patterson had complained
that officials had been administering Neurontin, which made him agitated and caused him unnecessary
pain; and that Patterson filed additional grievances against Stamp when he did not respond to his
complaint. IRO at p. 10 (citing Second Am. Compl. at pp. 52-53). The Initial Review Order dismissed
this claim against Stamp, and it permitted an Eighth Amendment claim against Dr. Ruiz related to his
conduct concerning the ESI and removal of Patterson from Dr. Ruiz's list of patients to evaluate because
"he did not believe in back surgery." IRO at p. 19. Thus, the case did not proceed on an Eighth
Amendment claim arising from Dr. Ruiz's deliberate indifference to Patterson's need for a change to his
pain medication, and Patterson cannot amend his complaint by making new assertions in opposition to
summary judgment.

than the severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187; *see also Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]") (internal citation omitted). As for the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin,* 467 F.3d at 280; *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate a prisoner's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

The record reflects that at the time of his transfer to Cheshire on May 23, 2018, Patterson had a pending URC request (submitted by Dr. Wright on May 10, 2018) for an orthopedic consult to determine appropriate treatment. *See* Defs.' Ex. L, Medical Records at p. 19. Thereafter, Patterson had his orthopedic consult in July 31, 2018, which recommended two additional ESIs during 2018 and then continued discussion regarding potential back surgery. *Id.* at p. 14-17. On August 14, 2018, within two weeks of the consult, Dr. Ruiz submitted the URC request for an ESI, which was approved and scheduled for October 16, 2018. *Id.* at pp. 7, 11-13, 18. As Patterson refused to proceed with the trip to UCONN to receive the ESI on October 16,

24

2018, Patterson later received the ESI on November 7, 2018. Defs.' Ex. L, Medical Records at pp. 8-13; Pl.'s Aff. at ¶ 185-187, & pp. 184-187 (refusal of service form asserting that he was not permitted to take his cane during transport as a result of conspiracy between Dr. Ruiz and Transportation Officer Sheldon; inmate request form asserting that denial of transportation was scheme designed by medical staff and DOC correctional officers); *see also* Second Am. Compl. at p. 79.[9]

Thereafter, on April 29, 2019, Dr. Ruiz met with Patterson about a hand injury; discussed his back injury and how back surgery could increase his chronic pain; noted he would submit another URC request for an ESI; and submitted the URC request for Patterson's next ESI. Defs.' Ex. G, Dr. Ruiz Declar. at ¶¶ 17-18, 27; Defs.' Ex. L, Medical Records at pp. 2, 6. Patterson was then transferred from Cheshire while the URC request was pending. Defs.' Ex. G at ¶¶ 19-20; Defs.' Ex. L, Medical Records at pp. 2, 5. He later received the ESI in October 2019. Defs.' Ex. L, Medical Records at pp. 3-4.

The evidence in the record does not support an Eighth Amendment claim based on any delay caused by Dr. Ruiz in Patterson's receipt of his first ESI after the orthopedic specialist consult. It was reasonable for Dr. Ruiz to await the views of the orthopedic specialist before making the request for the ESI, and he then made the request within two weeks of the consult. Patterson's ESI appointment had to be rescheduled due to his refusal to be transported on October 16, 2018. Patterson's assertion that Dr. Ruiz conspired to prevent him from receiving service on that day is wholly conclusory, speculative and without evidentiary foundation. *See* Pl.'s Aff. at ¶ 185; *Morgan v. Dzurenda*, No. 3:14-CV-966 (VAB), 2017 WL 1217092, at *10

---

[9]  As noted below, Patterson's assertions that Ruiz was somehow involved in denying him a cane for his transport to UConn Health in October 2018 are speculative and unsupported.

(D. Conn. Mar. 31, 2017) (concluding affidavit testimony to be too speculative and remote for a reasonable jury to find that the objective prong of the Eighth Amendment was satisfied). Accordingly, no reasonable juror could find that Dr. Ruiz violated the Eighth Amendment based on his request for the first ESI after the orthopedic consult on July 31, 2018.

The evidence concerning Dr. Ruiz's request for the next ESI is more ambiguous.   Dr. Ruiz did not submit that request until April 29, 2019, almost six months after Patterson's ESI on November 7, 2018 (5 months, 22 days).   But the consultation note from the November 7, 2018 ESI, which is part of Patterson's medical record submitted by Defendants, indicates that "[p]atient may benefit from repeat injection in 4 months" – which would have called for another injection in early March, 2019. ECF No. 69 at 8. In fact, even after Dr. Ruiz made the request on April 29, 2019, it would not be for almost another 6 months – October 2019 – that Patterson would receive the next ESI. ECF No. 69 at 3. Dr. Ruiz maintains that he has no control over the URC approval process. Defs.' Ex. G, Ruiz Declar. at ¶ 24. But as a physician who has worked with the Connecticut inmate population since 2002, Dr. Ruiz should be aware of the potentially long process for URC approval and provision of medical treatment. *See id.* at ¶ 2. Indeed, in this case Dr. Ruiz knew or should have known that it took over two months after he requested the ESI for Patterson in August 2018 for it to be approved and originally scheduled in October 2018. In light of this and in light of Patterson's continuing complaints about back pain, there is evidence that Dr. Ruiz was aware – or was reckless in being unaware – that waiting until April 29, 2019 to request a second ESI meant that Patterson would not receive it in anywhere close to the "4 months" suggested in the November 7, 2018 consultation note.   Patterson does not address this delay in his declaration, except to say that, by April 29, 2019, "sufficient time had

passed" for him to initiate another request for an ESI.   ECF No. 68-9 at ¶ 26.   That begs the question, however, whether *too much* time had passed, i.e., whether he could have and should have initiated the new request much sooner – perhaps shortly after receiving notice of the four months' recommendation in the November 7, 2018 consultation note.   The evidence suggests that Dr. Ruiz would have recognized that it could take months for the URC to act on the request. Finally, the record indicates that Dr. Ruiz was aware of Patterson's chronic pain and that the ESI could provide him with relief.[10]

Thus, it remains a question for the jury whether Dr. Ruiz's failure to act sooner needlessly prolonged delay between the provision of the two ESIs that were recommended by the orthopedist to provide Patterson relief from his chronic pain. *See Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness."). When the evidence is viewed in the light most favorable to Patterson, a reasonable juror could determine that Dr. Ruiz was aware of a substantial risk that Patterson would suffer serious pain as a result of his inaction and the ensuing delay in Patterson's receipt of his second ESI following the orthopedic consult. Accordingly, the court will deny the motion for summary judgment on Patterson's Eighth Amendment claim against Dr. Ruiz for his alleged deliberately indifferent conduct concerning his second ESI after his orthopedic consult.

---

[10]   Dr. Ruiz reviewed Patterson's July 27, 2018 HSR complaining about his need for the ESI shot and his excruciating pain, and Dr. Ruiz responded that an ESI had been requested; further, Dr. Ruiz also submitted the URC requesting Patterson's ESI due to his chronic pain. Defs.' Ex. L, Medical Records at p. 7; Defs.' Exhibit N, HSR.

But Patterson's Eighth Amendment claim against Dr. Ruiz related to back surgery fails. The record shows that Dr. Ruiz addressed Patterson's potential for back surgery on April 29, 2019, when he advised him that the back surgery may increase a patient's chronic pain. Defs.' Ex. L, Medical Records at pp. 6. Dr. Ruiz's declaration explains that his comments to Patterson regarding the merits of surgical intervention regarding chronic back pain were based on his decades of experience as a licensed physician and his past treatment of inmates with similar chronic back pain complaints; he states further that he would not have prevented Patterson from having the second consult with the orthopedics specialist to discuss Patterson's candidacy for surgical intervention, but Patterson had not completed the two ESIs recommended by the time Patterson left Cheshire and Dr. Ruiz's care. Defs.' Ex. G, Ruiz Declar. at ¶¶ 27.

Patterson has not adduced any evidence raising an inference that Dr. Ruiz took him off his evaluation list or that Dr. Ruiz acted with deliberate indifference to Patterson's need for back surgery. As no reasonable juror could conclude that Dr. Ruiz acted with deliberate indifference as to Patterson's alleged need for back surgery, the court will grant the motion for summary judgment on this Eighth Amendment claim.

###   5.  Nurse McClain

Patterson asserts an Eighth Amendment deliberate indifference claim against Nurse McClain due to her alleged refusal to address his complaints about his inadequate medical treatment at Cheshire. IRO at p. 19. Defendants argue that the evidence fails to show that Nurse McClain acted with deliberate indifference to Patterson's serious medical needs. Defs.' Mem. at 38-40. The court agrees.

28

Patterson maintains that McClain altered the date stamp on his July 27, 2018 HSR reviewed and responded to by Dr. Ruiz. Pl.'s Opp. at 23. On review, the court can discern that the date stamp has been marked over with a pen to reflect that the HSR was received by August 8, 2018, rather than August 28, 2018. *See* Defs.' Ex. N, HSR. However, this fact does not raise any inference that McClain acted with deliberate indifference to Patterson's medical needs. The record reflects that Nurse McClain forwarded his HSR to Dr. Ruiz, who responded on August 28, 2018, by noting that a lumbar ESI had been requested. *Id.*

Patterson maintains that McClain failed to provide him with certain responses to his grievances and spoliated, destroyed, or stole his grievance filings. *See* Pl.'s Opp. at 22-25; Pl.'s Rule 56(a) at ¶¶ 91, 96; Pl.'s Aff. at ¶¶ 223-224. However, Patterson provides no evidentiary support for these speculative assertions, or for his claim that McClain's alleged interference with his administrative remedies constituted deliberate indifference to his medical needs. In any event, allegations that prison officials violated inmate grievance procedures do not give rise to a cognizable Section 1983 claim because inmate grievance programs created by state law are not required by the Constitution. *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations, alterations, and quotation marks omitted). "Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, No. 3:19-CV-1444 (SRU), 2020 WL 127700, at *5 (D. Conn. Jan. 10, 2020) (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (claim relating to grievance procedures "confused a state-created procedural entitlement

with a constitutional right"; "neither state policies nor 'state statutes ... create federally protected due process entitlements to specific state-mandated procedures'")).[11]

As the evidentiary record fails to raise any issue of fact suggesting that McClain acted with deliberate indifference to Patterson's medical needs, no reasonable jury could conclude that Patterson should prevail on his Eighth Amendment claim against McClain. The court will grant the motion for summary judgment on Patterson's Eighth Amendment claim against McClain.

### B.  First Amendment Retaliation

Patterson's retaliation claim asserts that Quiros discovered that Patterson had complained about Quiros to the DOC Commissioner and thereafter instructed Cheshire ARC Boyd-Carter to forward Patterson's Level 3 grievances to him so that he could destroy them.    IRO at p. 18; *see* Second Am. Comp. at p. 38-39. Defendants maintain that this claim is speculative and implausible.[12] The court agrees.

To prevail on a First Amendment retaliation claim, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the

---

[11]  Patterson expresses concern that this law fails to protect his access to the courts because an inmate can access the federal courts only through exhaustion of grievance procedures. Pl.'s Opp. at 22. Patterson is advised that if prison officials did in fact thwart him "from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" Patterson would be excused from exhausting the grievance procedure because the administrative remedies would be considered unavailable and he could still proceed to federal court. *See Ross v. Blake*, -- U.S. --, 136 S. Ct. 1850, 1858-59 (2016) (explaining exception to exhaustion requirement when administrative remedies are unavailable). This does not, however, suggest that any misconduct by McClain in the grievance process is itself a violation of the Eighth Amendment.

[12]  Patterson's Opposition states that he brings claims of deliberate indifference and cruel and unusual punishment against the remaining five defendants in the action. Pl.'s Opp. at 1. Thus, it is not entirely clear that Patterson still wishes to pursue his First Amendment retaliation claim against Quiros. However, as Patterson's opposition materials reflect that he still advances his assertion that Boyd-Carter forwarded his Level 3 Grievances to Quiros who destroyed them or had them destroyed, the court will address Patterson's claim of First Amendment retaliation. *See* Pl.'s 56(a)2 at ¶¶ 53, 61; Pl.'s Opp. at 9-11; Pl.'s Aff. at ¶¶ 50-64.

plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019); *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted); *Booth v. Comm'r of Corr.*, No. 19-CV-100 (MPS), 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity.") (citation omitted).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 353). In order to allege causation, the inmate must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). "Some of the facts often used to determine retaliatory motive include (1) temporal proximity   between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

Courts treat prisoner retaliation claims "with skepticism and particular care, because

virtually any adverse action taken against a prisoner by a prison official—even those otherwise

not rising to the level of a constitutional violation—can be characterized as a constitutionally

proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation

omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be

supported by specific and detailed factual allegations, not stated in wholly conclusory

terms." *Dolan*, 794 F.3d at 295 (internal quotations and citation omitted).

Patterson provides no evidence to substantiate his conclusory assertion that Quiros, who

is commonly named in grievances and lawsuits, was motivated to take retaliatory action against

him for filing a complaint against him with the DOC Commissioner. *See* Defs.' Ex. C, Quiros

Declar. at ¶ 15 (noting that he has commonly been named as a defendant in grievances and

litigation during his tenure). Likewise, Patterson provides no evidentiary support for his

speculative assertion that Quiros instructed Cheshire ARC Boyd-Carter to forward Patterson's

Level 3 grievances to him so that he could "destroy them" and that Boyd-Carter followed his

instruction.

In his opposition, Patterson asserts that Boyd-Carter issued him receipts for his grievance

appeals and permitted him to proceed with his Level 3 Appeals on June 27, 2018. Pl.'s Opp. at 9.

Patterson then queries:

> Why did [B]oyd[-]Carter send the Level 3 Grievance Appeals back to Moore and why
> did Moore not forward the Grievance Appeals to Captain Synott for adjudication.
> Moreover why didn't Boyd[-]Carter forward these two grievances to Synott directly
> instead of sending the Level 3 Appeals back to 115 Osborn from 125 Cheshire where the
> only person with the power to adjudicate these two Grievance Appeals in that 115 Region
> is Quiros.

*Id*. at 9-10. Patterson's affidavit makes the unsupported claim that Quiros had Cheshire ARC

Boyd-Carter send his Level 3 grievances to Osborn rather than to the DOC Commissioner or his

designee for adjudication, and he complains that Quiros denied him the right to appeal to Level 3. Pl.'s Aff. at ¶¶ 50-51, 94.

In their declarations, Boyd-Carter and Captain Synott have explained that Patterson's Level 3 Grievances were provided receipt numbers and then forwarded by Boyd-Carter to the DOC Central Office of the statewide grievance coordinator Captain Synott, who determined that his Level 3 Grievances were ineligible for Level 3 review.[13]  Defs.' Ex. I, Boyd-Carter Declar. at ¶¶ 8-11, 14; Defs.' Ex. J, Synott Declar. at ¶¶ 5-13. Patterson's conjecture about how and why Boyd-Carter handled his Level 3 grievances fails to raise an inference that Boyd-Carter sent any grievances to Quiros so that he could take retaliatory action against Patterson.

Based on the record evidence, no reasonable jury could conclude that Quiros took retaliatory action against Patterson due to Patterson's filing a complaint about Quiros with the DOC Commissioner. The court will grant the motion for summary judgment on this claim against Quiros.

## IV.    CONCLUSION

For the reasons stated above, the motion for summary judgment [ECF No. 68] is GRANTED in part and DENIED in part.

The court GRANTS the motion for summary judgment on Patterson's Eighth Amendment claims against Wright, Paolini, Quiros, and McClain (Stephanie Doe); on Patterson's Eighth Amendment claim against Matzko (Rick Doe) for failure to provide him with pain medication; and on Patterson's Eighth Amendment claim against Dr. Ruiz related to

---

[13]    As previously noted, Administrative Directive 9.6(6))(L) restricts Level 3 Grievances to challenges to department policy, the integrity of the grievance procedure, or Level 2 Appeals to which there has been an untimely response by the District Administrator.

Patterson's first ESI after his orthopedic consult and Patterson's need for back surgery. The court also GRANTS the motion for summary judgment as to Patterson's First Amendment retaliation claims against Molina, Tross (T. Ross), and Quiros.

The court DENIES the motion for summary judgment as to Patterson's Eighth Amendment claim against Matzko related to the denial of the x-ray and assistive devices after his fall; and as to his Eighth Amendment claim against Dr. Ruiz related to his need for a second ESI after his orthopedic consult.

The clerk is instructed to deny the Motions in Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 70, 74), which the court has construed as memoranda in opposition to the motion for summary judgment.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 22d day of February, 2021, at Hartford, Connecticut.